United States District Court
Southern District of Texas
**ENTERED**
March 25, 2024
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| FERNANDO LAGUNAS, on behalf of himself and others similarly situated, | § § § § | |
| Plaintiff, | § | CIVIL ACTION NO. H-22-17 |
| v. | § § | |
| LA RANCHERA, INC., | § § | |
| Defendant. | § § | |

**MEMORANDUM AND OPINION**

Fernando Lagunas drives a truck to deliver tortillas to customers of his employer, La Ranchera, Inc. Lagunas alleges that La Ranchera failed to pay him and other similarly situated "distributors" overtime pay for working more than 40 hours in a work week, in violation of the Fair Labor Standards Act. The court certified a class of "individuals that drove delivery trucks for La Ranchera between January 4, 2019, and January 4, 2022." Only one plaintiff, Mayra L. Acosta, opted into the class in response to the class notice. La Ranchera moves for summary judgment against Lagunas and Acosta. The motions are denied, for the reasons set out below.

I.      **Background**

La Ranchera, Inc. manufactures corn and flour tortillas. La Ranchera contracts with distributors to market and deliver its tortillas to customers. In October 2019, Fernando Lagunas entered a "Distributor Agreement" with La Ranchera. (Docket Entry No. 68-1). The Agreement stated that Lagunas was "an independent contractor and not an agent or employee of La Ranchera's." (*Id.* at 11). Lagunas's duties under the Agreement were to "market[] and deliver[] [] La Ranchera products." (*Id.* at 2). In exchange, La Ranchera would pay him "either 17 percent

of the customer collections delivered by [] [Lagunas] to La Ranchera" each week "or such other percentage commission as La Ranchera shall in its sole discretion establish based upon its relationship with particular customers." (*Id.* at 9).

Lagunas was required to supply his own delivery vehicle, which had to be branded "with two or more signs visible to the public giving the name of the Distributor and the words, 'Independent Delivery Contractor for La Ranchera, Inc.'" (*Id.* at 7). The Agreement provided that Lagunas could "employ[] someone" to help him perform his duties, at his "discretion and cost." (*Id.* at 2). The Agreement further provided that Lagunas would "determine his[] own delivery schedule" and "designate the place and time deadline for delivery, in consultation with customers." (*Id.* at 3).

When Lagunas first began driving as a distributor for La Ranchera, he worked an average of 84 to 90 hours per week. (Docket Entry No. 68-2 at 2). In October 2021, however, La Ranchera reduced his delivery route. (*Id.*). This "significantly reduced the amount of work and the amount of money" he was paid. (*Id.*). La Ranchera demanded that Lagunas "seek out new customers" before it would increase his route. (*Id.*). When Lagunas failed to do so, La Ranchera terminated his employment. (*Id.*).

In January 2022, Lagunas filed this action on behalf of himself and a putative class of "current and former employees and/or independent contractors of [La Ranchera] who work/worked as route drivers – sales representatives within the last three years." (Docket Entry No. 1 at 1). He alleges that La Ranchera violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, by failing to pay him and other "route drivers – sales representatives" overtime wages and by making "improper deductions" from their wages. (*Id.*).

2

In August 2023, the court certified a class consisting of "individuals that drove delivery trucks for La Ranchera between January 4, 2019, and January 4, 2022." (Docket Entry No. 55 at 2). Opt-in notices were published, and one individual, Mayra L. Acosta, opted into the class. (Docket Entry No. 62).

In January 2024, La Ranchera filed two motions for partial summary judgment, one against Lagunas and one against Acosta. (Docket Entry Nos. 65, 67). Lagunas and Acosta responded, (Docket Entry Nos. 68, 69), and La Ranchera replied, (Docket Entry Nos. 70, 71). Based on the record, the motions, responses, replies, and applicable law, the motions are denied. The reasons are set out below.

## II.    The Legal Standards

### A.    Rule 56

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)). "A fact is material if it might affect the outcome of the suit and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021) (quoting reference omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion[] and identifying" the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the

burden of demonstrating by competent summary judgment proof that there is [a dispute] of material fact warranting trial." *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration in original) (quoting reference omitted).  "However[,] the movant 'need not negate the elements of the nonmovant's case.'" *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).  "If 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

After the movant meets its Rule 56(c) burden, "the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quoting references omitted).  The nonmovant "must identify specific evidence in the record and articulate the 'precise manner' in which the evidence" aids their case. *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (quoting reference omitted).  Of course, all reasonable inferences are drawn in the nonmovant's favor.  *Loftin v. City of Prentiss*, 33 F.4th 774, 779 (5th Cir. 2022).  But a nonmovant "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021) (quoting reference omitted).

### B.      The Fair Labor Standards Act

The Fair Labor Standards Act provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  "An employee bringing an action for unpaid overtime compensation must first demonstrate by a

preponderance of the evidence: (1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due." *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014).

"Since the FLSA is limited to employees, an employer can avoid the minimum wage requirement by establishing that a particular person is an independent contractor rather than an employee." *Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1188 (5th Cir. 1979). The Fifth Circuit uses the "economic reality" test to determine whether workers are employees or independent contractors. *Flores v. FS Blinds, L.L.C.*, 73 F.4th 356, 365 (5th Cir. 2023). "In determining whether workers are employees or independent contractors, the pertinent question is whether the alleged employees, as a matter of economic reality, are economically dependent on the business to which they supply their labor and services, or are in business for themselves." *Id.* (quotation marks and quoting reference omitted) (alterations adopted). Courts consider the following non-exhaustive factors:

(1) the degree of control exercised by the alleged employer;

(2) the extent of the relative investments of the worker and the alleged employer;

(3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer;

(4) the skill and initiative required in performing the job; and

(5) the permanency of the relationship.

*Id.*

Courts "do not consider labels attached to the relationship by the alleged employees or employer unless they mirror economic reality." *Id.* (quotation marks and quoting reference

omitted).  "[I]t is not what the [parties] could have done that counts, but as a matter of economic reality what they actually do that is dispositive."  *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1047 (5th Cir. 1987); *see also Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1312 (5th Cir. 1976) ("It is not significant how one 'could have' acted under the contract terms.  The controlling economic realities are reflected by the way one actually acts.").  "The contractual designation of the worker as an independent contractor is not necessarily controlling."  *Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843, 845–46 (5th Cir. 2010).

"The ultimate determination about whether a worker is an employee or independent contractor is a question of law.  But the findings as to the five factors and the historical findings of fact that underlie those findings are questions of fact."  *Flores*, 73 F.4th at 365 (cleaned up) (citation omitted).  The economic reality test is "fact intensive."  *Id.* at 366.  However, "[a] fact issue does not exist simply because facts point in both directions."  *Faludi v. U.S. Shale Solutions, L.L.C.*, 950 F.3d 269, 275 (5th Cir. 2020).

"If the employer claims that the suing employee is exempt from the overtime requirement, then the employer has the burden of proving that the employee falls within the claimed exempted category."  *Johnson*, 758 F.3d at 630 (quotation marks and quoting reference omitted).  "The employer must prove facts by a preponderance of the evidence that show the exemption is 'plainly and unmistakably' applicable."  *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581 (5th Cir. 2013) (quoting reference omitted).  The FLSA exempts from overtime-pay requirements "any employee employed . . . in the capacity of outside salesman."  29 U.S.C. § 213(a)(1).  "The logic of the exemption is that such a salesman, to a great extent, works individually.  There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates.  An outside salesman's extra compensation comes in the

form of commissions, not overtime, and because most of the salesman's work is performed away from the employer's place of business, the employer often has no way of knowing how many hours an outside salesman works."  *Meza*, 720 F.3d at 581 (cleaned up) (citation omitted).

## III.   The Motion Against Lagunas

La Ranchera argues that Lagunas has failed to raise a genuine factual dispute material to determining whether he was an employee of La Ranchera.  According to La Ranchera, the record supports finding, as a matter of law, that Lagunas was an independent contractor, not an employee.  Alternatively, La Ranchera argues that Lagunas is exempt from overtime pay because he is properly classified as an outside salesman under § 213(a)(1).

### A.   Employee Status

It is Lagunas's burden to prove that "there existed an employer-employee relationship during the unpaid overtime periods claimed."  *Johnson*, 758 F.3d at 630.  "[W]hether a worker is an employee for FLSA purposes is a question of law."  *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 377 (5th Cir. 2019).  The question on summary judgment is whether Lagunas has submitted or pointed to evidence raising a genuine factual dispute material to determining whether he was La Ranchera's employee.

Instead of applying the five economic reality factors discussed above, both parties appear to agree that the governing factors are the four set out in *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012).  The court disagrees that *Gray* applies when the specific question is not merely whether the defendant was the plaintiff's employer, but whether the plaintiff was an independent contractor.  Recent Fifth Circuit caselaw addressing that issue applies the five-factor test originally set out in *United States v. Silk*, 331 U.S. 704 (1947), not the four *Gray* factors.  *See, e.g.*, *Flores*, 73 F.4th 356; *Faludi*, 950 F.3d 269; *Parrish*, 917 F.3d 369; *Thibault*, 612 F.3d 843; *Hopkins v. Cornerstone*

7

*America*, 545 F.3d 338 (5th Cir. 2008).  Accordingly, the court applies the *Silk* factors to the summary judgment evidence presented.  Ultimately, whether *Silk* or *Gray* applies is not outcome-determinative because the evidence relevant to the two tests is largely the same.

### 1. The Degree of Control

"Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that []he stands as a separate economic entity." *Hopkins*, 545 F.3d at 343.  "The lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Id.* (quoting reference omitted and alteration adopted).

The evidence shows that Lagunas had a significant degree of independence in his work:

- "La Ranchera did not restrict Mr. Lagunas from calling upon customers nor did La Ranchera require that certain amounts of its product be delivered on a regular basis."  (Docket Entry No. 37-17 at ¶ 5).

- "None of Mr. Lagunas' work was performed under the supervision of any other individuals."  (*Id.*).

- "La Ranchera did not require that Mr. Lagunas work a set number of hours" or determine his delivery schedule.  (*Id.*; Docket Entry No. 68-1 at 3).

- La Ranchera "did not have any of its own marketing strategies, [but] relied on its drivers to sell its product."  (Docket Entry No. 68-2 at ¶ 8).

- Lagunas drove his own truck to make deliveries for La Ranchera.  (Docket Entry No. 68-3 at 1–2; Docket Entry No. 68-1 at 1).

- Lagunas hired his own employees to assist him in making deliveries.  (Docket Entry No. 68-3 at 4; Docket Entry No. 68-1 at 1).

On the other hand, there is evidence that La Ranchera exercised significant control over several aspects of Lagunas's work:

- La Ranchera drivers, including Lagunas, "were required to drive trucks displaying the La Ranchera name while transporting its goods."  (Docket Entry No. 68-4 at ¶ 3; Docket Entry No. 68-1 at 7).

- La Ranchera assigned its drivers specific territories and routes, which "could be changed at La Ranchera's discretion."  (Docket Entry No. 68-4 at ¶ 4; Docket Entry No. 37-17 at ¶ 5 ["La Ranchera assigned Mr. Lagunas his own territory within which to conduct his marketing and sales activities."]; Docket Entry No. 68-1 at 8).

- La Ranchera exercised its discretion to reduce Lagunas's route, "significantly reduc[ing] the amount of work and the amount of money [he] was paid."  (Docket Entry No. 67-2 at ¶ 3; Docket Entry No. 68-3 at 10–11).

- La Ranchera "t[ook] [clients] away from" Lagunas and other drivers.  (Docket Entry No. 67-16 at 1).

- La Ranchera demanded that Lagunas "begin to seek out new customers, without pay, to increase [his] route."  (Docket Entry No. 68-2 at ¶ 3).  When Lagunas "did not comply with La Ranchera's demand, [his] employment was terminated."  (*Id.*).

- La Ranchera deducted the pay of its drivers if customers "complained about the condition of a product."  (Docket Entry No. 67-2 at ¶ 5).

- La Ranchera deducted the pay of drivers who mistakenly undercharged customers.  (Docket Entry No. 68-3 at 15–16).

- La Ranchera threatened to fire drivers who mistakenly placed incorrect product orders.  (*Id.* at 13).

- La Ranchera oversaw, through communications with store supervisors, drivers' performance organizing display shelves in stores.  (*Id.* at 12–13).

- La Ranchera prohibited drivers from transporting or selling competitive products. (Docket Entry No. 68-4 at ¶ 5; Docket Entry No. 68-1 at 4).

- La Ranchera required drivers "to arrive between 4:00 and 6:00 A.M. at La Ranchera's Houston loading facility to pick up the product [they] would be delivering [each] day."  (Docket Entry No. 68-4 at ¶ 6; Docket Entry No. 68-1 at 3).

- La Ranchera "expected [drivers] to work long hours to meet La Ranchera's business needs."  (Docket Entry No. 68-4 at ¶ 6).

- La Ranchera required its drivers "to deal with customers in the same manner and [] reprimanded [them] if [they] did not adhere to these requirements."  (*Id.* at ¶ 7).

- La Ranchera "had the power to hire and fire drivers."  (*Id.* at ¶ 9).

- La Ranchera, not its drivers, "negotiate[d] prices for its products directly with its customers."  (Docket Entry No. 68-1 at 6).

On balance, this evidence does not show that Lagunas "exert[ed] such a control over a meaningful part of the business that []he stands as a separate economic entity" from La Ranchera. *Hopkins*, 545 F.3d at 343.  La Ranchera controlled aspects of how Lagunas and other drivers did their work.  La Ranchera determined the drivers' territories and routes.  *See id.* at 344 ("Cornerstone determined the geographic territories where the Sales Leaders and their subordinates could operate.").  La Ranchera used this authority to provide incentives for Lagunas to solicit new customers, demanding that he recruit new customers and firing him when he did not. La Ranchera disciplined drivers for mistakes or poor performance by docking their pay.  Finally,

10

La Ranchera prohibited drivers from transporting or selling competing products. *See id.* ("'[O]ne of the tenets' of Cornerstone's business was that leaders could not sell competing products if they wanted to 'receive leads' and 'have their compensation advanced.'").

La Ranchera relies on the declaration of its Chief Financial Officer, Brian Trujillo, to argue that Lagunas exerted control over a meaningful part of how he performed the work of driving a delivery truck for La Ranchera. But many of Trujillo's statements about Lagunas's independence are contradicted by other record evidence. For example, Trujillo stated that La Ranchera did not "require that certain amounts of its product be delivered on a regular basis" or "require that Mr. Lagunas work a set number of hours." (Docket Entry No. 37-17 at ¶ 5). But Lagunas testified that La Ranchera "expected [drivers] to work long hours to meet La Ranchera's business needs," and that La Ranchera fired him for not recruiting more customers. (Docket Entry No. 68-4 at ¶ 6; Docket Entry No. 68-2 at ¶ 3). Trujillo also stated that "[n]one of Mr. Lagunas' work was performed under the supervision of any other individuals." (Docket Entry No. 37-17 at ¶ 5). But Lagunas testified that La Ranchera would receive reports on drivers' performance from customers and would reprimand and penalize drivers who made mistakes or performed poorly. (Docket Entry No. 68-4 at ¶ 5; Docket Entry No. 68-3 at 13, 15–16).

On the current record, this factor weighs in favor of finding employee status.

### 2.    The Extent of the Relative Investments

This factor compares the "worker's individual investment to that of the alleged employer." *Hopkins*, 545 F.3d at 344. It is clear on this record that La Ranchera's overall investment in the business scheme is by far the greater. The only investments Lagunas made were the truck he purchased for deliveries (which had to be branded with La Ranchera's name to meet La Ranchera's requirements) and the time he spent delivering and selling products for La Ranchera.

11

On the current record, this factor weighs in favor of finding employee status.  *See id.*

### 3.     The Degree to Which the Worker's Opportunity for Profit or Loss is Determined by the Alleged Employer

Under the Distributor Agreement, La Ranchera agreed to pay Lagunas "either 17 percent of the customer collections [he] delivered . . . to La Ranchera" each week "or such other percentage commission as La Ranchera shall in its sole discretion establish based upon its relationship with particular customers."  (Docket Entry No. 68-1 at 9).  La Ranchera also set the prices for its products, except that the Agreement allowed that Lagunas "may set prices for new customers provided by Distributor."  (*Id.* at 6).  The record reflects that Lagunas's pay depended on his territory and route, which were determined by La Ranchera.  *See Hopkins*, 545 F.3d at 344 (concluding that this factor weighed in favor of employee status in part because the defendant "unilaterally defined the Sales Leaders' territories").  Lagunas's ability to generate income from driving his delivery truck was also limited by La Ranchera's prohibition on selling competing products.  *Compare Hickey v. Arkla Industries, Inc.*, 699 F.2d 748, 750–51 (5th Cir. 1983) (observing that the plaintiff, a gas-products salesman, could sell competitors' products and concluding that he was an independent contractor).

La Ranchera asserts, without record support, that Lagunas's commission was negotiable.  Lagunas testified that "the commission [was] not negotiable" but was "established by the company."  (Docket Entry No. 68-3 at 9).  La Ranchera also asserts that commission-based pay is a "hallmark of independent contractor status."  (Docket Entry No. 71 at 17).  But the Fifth Circuit has held that some plaintiffs who were paid commissions were employees, not independent contractors, without statements that the fact of commission payments signaled independent contractor status.  *See Hopkins*, 545 F.3d at 344.

On the current record, this factor weighs in favor of finding employee status.

### 4.      The Skill and Initiative Required

This factor concerns "whether the worker exhibits the type of skill and initiative typically indicative of independent-contractor status." *Id.* at 345.  "Routine work which requires industry and efficiency is not indicative of independence and nonemployee status." *Usery*, 527 F.2d at 1314.  Rather, what supports independent-contractor status is "some unique skill set . . . or some ability to exercise significant initiative within the business." *Hopkins*, 545 F.3d at 345 (citations omitted).

The record does not support finding that Lagunas's work for La Ranchera required any specialized skills.  Certainly, general skills "such as business sense, salesmanship, personality and efficiency" would be an advantage in the job, but such skills "are not relevant to the employee-status inquiry." *Id.* (quoting *Usury*, 527 F.2d at 1314).  The record shows that Lagunas had some opportunity to use his initiative to acquire new clients, but this opportunity was limited because La Ranchera set the prices and would penalize Lagunas for deviating from them.  *See id.*

On the current record, this factor favors finding employee status.

### 5.      The Permanency of the Relationship

This factor is concerned more with "the actual length of the working relationship" than with contractual terms governing termination of the relationship.  *Id*.  The record shows that Lagunas worked for La Ranchera from October 2019 to November 2021.  (Docket Entry No. 68-2 at ¶ 2).  The Distributor Agreement was effective for one year and provided for termination by either party on 30 days' written notice.  (Docket Entry No. 68-1 at 10).  La Ranchera could also terminate the relationship "for cause in its sole discretion" without giving advance notice.  (*Id.*).

This factor slightly favors independent-contractor status because of the short actual length of the working relationship, the short term of the Distributor Agreement, and the fact that Lagunas

could, with 30 days' notice, terminate the relationship and begin driving for "other manufacturers of similar or different products." *Hickey*, 699 F.2d at 752.

Only one of the five *Silk* factors weighs in favor of finding independent contractor status. Based on the current record, the court concludes that, as a matter of economic reality, Lagunas was economically dependent on La Ranchera's business rather than being "in business for [himself]." *Flores*, 73 F.4th at 365.

### B.     The Outside Salesman Exemption

La Ranchera argues that even if Lagunas is an employee rather than an independent contractor, his Fair Labor Standards Act claim fails as a matter of law because the outside salesman exemption applies.  This exemption applies if La Ranchera shows that, as a matter of law, Lagunas was an "employee employed in the capacity of outside salesman." 29 C.F.R. § 541.500(a).  That turns on whether: (1) Lagunas's "primary duty" was "making sales within the meaning of section 3(k)[1] of the Act," and (2) Lagunas was "customarily and regularly engaged away from the employer's place or places of business in performing such duty."  (*Id.*).  "Primary duty" means "the principal, main, major or most important duty that the employee performs."  § 541.700(a).

"Drivers who deliver products and also sells such products," like Lagunas, "may qualify as exempt outside sales employees only if the driver has the primary duty of making sales.  In determining the primary duty of drivers who sell, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including loading, driving or delivering products, shall be regarded as exempt outside sales work."  § 541.504(a).

Section 541.505(b) lists "[s]everal factors that should be considered in determining if a driver has a primary duty of making sales, including, but not limited to:

---

[1]  Section 3(k), or § 203(k), defines "[s]ale" or "sell" to include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."

(1) a comparison of the driver's duties with those of other employees engaged as truck drivers and as salespersons;

(2) possession of a selling or solicitor's license when such license is required by law or ordinances;

(3) presence or absence of customary or contractual arrangements concerning amounts of products to be delivered;

(4) description of the employee's occupation in collective bargaining agreements;

(5) the employer's specifications as to qualifications for hiring;

(6) sales training;

(7) attendance at sales conferences;

(8) method of payment; and

(9) proportion of earnings directly attributable to sales.

§ 541.505(b).  "The list of factors is not exhaustive, and a simple tally of the factors does not categorically settle the matter."  *Meza*, 720 F.3d at 583.

The regulations provide the following examples of drivers who may qualify as exempt outside salesmen:

(1) A driver who provides the only sales contact between the employer and the customers visited, who calls on customers and takes orders for products, who delivers products from stock in the employee's vehicle or procures and delivers the product to the customer on a later trip, and who receives compensation commensurate with the volume of products sold.

(2) A driver who obtains or solicits orders for the employer's products from persons who have authority to commit the customer for purchases.

(3) A driver who calls on new prospects for customers along the employee's route and attempts to convince them of the desirability of accepting regular delivery of goods.

(4) A driver who calls on established customers along the route and persuades regular customers to accept delivery of increased amounts of goods or of new products, even though the initial sale or agreement for delivery was made by someone else.

§ 541.504(c).

15

The regulations provide the following examples of drivers "who generally would not qualify as exempt outside sales employees":

> (1) A route driver whose primary duty is to transport products sold by the employer through vending machines and to keep such machines stocked, in good operating condition, and in good locations.
>
> (2) A driver who often calls on established customers day after day or week after week, delivering a quantity of the employer's products at each call when the sale was not significantly affected by solicitations of the customer by the delivering driver or the amount of the sale is determined by the volume of the customer's sales since the previous delivery.
>
> (3) A driver primarily engaged in making deliveries to customers and performing activities intended to promote sales by customers (including placing point-of-sale and other advertising materials, price stamping commodities, arranging merchandise on shelves, in coolers or in cabinets, rotating stock according to date, and cleaning and otherwise servicing display cases), unless such work is in furtherance of the driver's own sales efforts.

§ 541.504(d).

The parties' disagreement as to the applicability of this exemption turns on their conflicting characterizations of Lagunas's primary duty.  La Ranchera characterizes his primary work as selling; Lagunas characterizes it as primarily that of driving to deliver La Ranchera products.  The Department of Labor regulations and cases interpreting them suggest that an important, potentially determinative, factor in deciding whether a driver is a salesman or a deliveryman is whether the driver delivers the products to customers "pursuant to any pre-existing contractual arrangements," for example, by "merely fulfilling the terms of contracts that had been arranged by [] supervisors or [] management."  *See Meza*, 720 F.3d at 584, 86 (citing *Hodgson v. Krispy Kreme Doughnut Co.*, 346 F. Supp. 1102 (M.D.N.C. 1972)); *Skipper v. Superior Dairies, Inc.*, 512 F.2d 409, 416 (5th Cir. 1975); *Jewel Tea Co. v. Williams*, 118 F.2d 202, 208 (10th Cir. 1941).

In *Meza*, the Fifth Circuit considered whether the outside salesman exemption applied to a plaintiff employed as a route salesman for a company that sold and delivered food and beverages

16

to convenience stores.  720 F.3d at 578.  The court concluded that the exemption applied, based on the following facts:

- The employer had trained the employee "by having him shadow an experienced salesman for a month."  *Id.* at 578.

- The employer, at each stop on his route, "would greet the store attendant, inspect any [employer]-distributed goods on the shelves, remove those that were past or close to their expiration date, and make a list of goods that needed to be restocked on his handheld computer."  *Id.* at 579.

- If a store did not carry a particular product, the employee "would try to sell it by pointing out that it had sold well in other stores, or by giving the attendant or cashier a sample."  *Id.*

- The employee "would [] try to improve the placement of certain goods—for example, he would sometimes negotiate for space near the cash register where 'impulse merchandise' was sold."  *Id.*

- "The attendant would check [the employee]'s list of goods to be purchased or restocked and approve or reject the order."  *Id.*

- Other employees of the company "were not permitted to make regular sales."  *Id.*

- The employee "was [] authorized to visit stores that did not yet carry any of [the employer]'s products to try to develop new business.  At these stops, [the employee] would introduce himself and present photographs or samples of the products he was selling.  Any sales were recorded using [the employee]'s handheld computer.  [The employee] successfully recruited a number of new customers, including one shortly before the end of his employment."  *Id.*

17

- "[R]oute salesmen were expected to attend weekly hour-long sales training meetings, though [they were not given] opportunities to attend sales conferences. At the sales training meetings, managers would announce sales contests, explain sales strategies, and tell the salesmen about any products [the company] was promoting." *Id.* at 579–80.

- The company "also employ[ed] warehouse drivers, whose duties include delivering goods to customers," but who did not "receive sales commissions." *Id.* at 580.

Similarly, the Tenth Circuit held in *Jewel Tea Co. v. Williams*, 118 F.2d 202, that door-to-door salesmen of coffee and tea products were outside salesmen. The company "place[d] great emphasis on [the] selling ability" of the salesmen it hired, "carefully train[ing] [the]m over a period of one to three weeks in selling methods and techniques." *Id.* at 204. Employees were required to attend meetings every two weeks for instruction in sales. *Id.* Before leaving the house of each customer, "the salesman [was] expected to obtain from the customer the name and address of one of the customer's friends or relatives who might be interested in becoming a [] customer," giving the salesman the "opportunity to obtain new customers and increase the earnings from his route." *Id.* The court concluded that the salesmen "were primary employed to effect sales of the Company's merchandise" and "were not routine deliverymen. . . . Their efforts were chiefly devoted to effect sales and delivery were merely incidental to sales. The greater portion of their time was devoted to salesmanship and only a small part to delivery of goods ordered." *Id.* at 208.

In *Hodgson v. Krispy Kreme Doughnut Co.*, 346 F. Supp. 1102, the Middle District of North Carolina applied the exemption to individuals delivering doughnuts on specified routes. The individuals were "responsible in [their] territory for obtaining new regular customers; for keeping and serving old regular customers; for developing additional sales to established regular

customers; employing practices and techniques to meet and combat constant competition from other snack items and from some four or more other doughnut distributors." *Id.* at 1104. "Each salesman determine[d] the number of doughnuts to be ordered daily to service his customers, and plant production for outside sales [wa]s based on such orders." *Id.* at 1104.

By contrast, the Fifth Circuit held in *Skipper v. Superior Dairies, Inc.*, 512 F.2d 409, that a route driver working for a dairy company to sell dairy products to convenience stores was not an "outside salesman" within the meaning of 29 C.F.R. § 541.500(a). The route driver "did no selling, in the sense that he had no face-to-face negotiation with a store owner or manager who was in the position of purchasing or ordering the products which [he] was delivering." *Id.* at 413. "[T]he right to place the product in each individual store . . . was obtained by negotiation between the management officials of [the company] and officials of [the stores]." *Id.* The driver delivered only "his estimate of the amount . . . of each item which he thought would be needed to bring the supply previously left with the individual store back to an equal amount on each trip." *Id.* The driver "made no effort to increase the amount of his deliveries to a unit over the amount that had previously been dropped." *Id.* at 414. The driver's job was "merely [to] deliver daily supplies to designated stores, rather than going out on a route on his own and undertaking to build up new customers for his dairy products." *Id.* The court held that the exemption did not apply because the driver merely delivered products furnished by the company "to predetermined customers in amounts" that were "exactly or approximately prearranged by customer or contractual arrangement or in amounts specified by the customer and not significantly affected by solicitations of the customer by the delivering driver." *Id.* at 416 (quoting 29 C.F.R. § 541.505(c)).

In light of this case law, La Ranchera has failed to establish, on the current record, that the outside salesman exemption is "plainly and unmistakably applicable" to Lagunas. Although

selling products was undoubtedly part of Lagunas's job duties under the Distributor Agreement, there is little evidence in the record that Lagunas actually engaged in the sort of salesmanship present in *Meza*, *Jewel Tea*, and *Hodgson*.  Lagunas was fired because he did not "seek out new customers," (Docket Entry No. 68-2 at ¶ 3), and there is no evidence that Lagunas attempted to increase the number of products purchased by current customers.  The record does not allow the court to determine, as a matter of law, whether Lagunas was primarily a salesman, as in *Meza*, *Jewel Tea*, and *Hodgson*, or whether he, like the driver in *Skipper*, "merely deliver[ed] daily supplies to designated stores, rather than going out on a route on his own and undertaking to build up new customers."  *Skipper*, 512 F.2d at 414.  And unlike the salesmen in *Meza* and *Jewel Tea*, there is no evidence that Lagunas received sales training from La Ranchera.  *See* 29 C.F.R. § 541.505(b).

To be sure, some of the § 541.505(b) factors support the applicability of the exemption. Lagunas's pay was based on sales commissions, (Docket Entry No. 68-1 at 9), and, according to Trujillo, La Ranchera required distributors to have previous sales experience, (Docket Entry No. 37-17 at ¶ 4).  However, these factors alone are insufficient to establish, at the summary judgment stage, that Lagunas's primary duty was making sales.

La Ranchera's motion for summary judgment against Lagunas is denied.  (Docket Entry No. 67).

## IV.   The Motion Against Acosta

La Ranchera's motion for summary judgment against Acosta is based solely on the assertion that she "cannot demonstrate having performed any work for La Ranchera so as to be entitled to overtime pay."  (Docket Entry No. 65 at 3).  According to La Ranchera, Acosta's husband, Omar Acosta, was "the individual who actually performed work for" and was employed

20

by La Ranchera.  (*Id.*).  La Ranchera also argues that, to the extent Acosta did any work for La Ranchera, she "cannot show La Ranchera had constructive knowledge of work she performed because all evidence submitted demonstrates La Ranchera legitimately believed Omar Acosta was performing the work, not Mayra Acosta."  (*Id.* at 4).

Acosta has produced evidence raising a genuine factual dispute material to determining whether she performed work for La Ranchera entitling her to overtime pay.  She submitted La Ranchera payroll documents showing commission payments to "Mayra L. Acosta."  (Docket Entry No. 69-1).  La Ranchera's argument that this evidence does not show that Acosta actually performed work for La Ranchera requires the court to flip the Rule 56 standard and view the evidence in the light most favorable to La Ranchera.

Finally, the court rejects La Ranchera's argument that Acosta's claim is barred by the applicable statute of limitations because La Ranchera raised this argument for the first time in its reply brief.  *See Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived.").

## V.    Conclusion

La Ranchera's motions for summary judgment are denied.  (Docket Entry No. 65, 67).


SIGNED on March 25, 2024, at Houston, Texas.


_____
Lee H. Rosenthal
United States District Judge